15-1430 John M. E. Saad, Petitioner v. Securities and Exchange Commission Ms. Coff for the Petitioner, Ms. Mishra for the Respondent Good afternoon. My name is Sarah Coff and I represent the Petitioner, John Saad, in this case. The SEC's decision affirming FINRA's lifetime ban on Mr. Saad for submitting just over $1,000 in false expense reimbursements is an abuse of discretion and it should be overturned. This court has called a lifetime bar the securities industry equivalent of capital punishment. So what FINRA imposed here was capital punishment for $1,000 of loss. It's also the misleading or evasive or however you want to describe it behavior when the investigation first kicked in. How should that be factored in, do you think, or should it be? Well, I think obviously it should be considered. It was something that was considered below. But I think the evidence of it, in fact, is quite weak. The FINRA and the Commission make much of it. But when you actually look at what they cite, the facts, rather than just their statements that there was a dishonest scheme or a cover-up, this was before Mr. Saad had counsel. It was two statements. It was an e-mail. Are you challenging? I don't remember reading anything suggesting you're challenging the factual findings. I thought your only challenge was to the penalty. Is that right? Your Honor, I'm not challenging that these facts exist. I'm challenging the conclusions that were drawn from them. Right, but you're not challenging the fact that he forged receipts? No, Your Honor. No, this was on the statements to the investigators, right? Yes. Right. So the first was a statement. You're not really challenging those either, but you're trying to put them in context, so go ahead. Absolutely, Your Honor. They do need to be put into context. One was a statement to an investigator saying that the travel expenses were for a future trip, which was not true. And the second was, one of them was that he didn't remember whether or not he purchased a ticket, which is not a false statement, but just the failure to remember, and he did correct it. And there was a third one, which was... But that's, the reason I ask is that your opening statement said it was just based on the reimbursement. It's a little more than that. You know, you still have your main theme, which is this is a significant penalty for the conduct, but it's a little more than just the... I have a factual question, too, and maybe it's not in the record anywhere, so if it's not, just tell me that. But why did he go to the hotel in Atlanta that weekend and not, I know the trip was canceled. Do you know the answer to that? Is that in the record? He was under a tremendous amount of stress, and that is one of the mitigating factors in the case. And it's one of the factors that the SEC on remand wanted to completely dismiss. The reason he went to the hotel was he was under a tremendous amount of stress for two reasons, but really one was primary, and that was the illness of one of his twin infants. On remand, we submitted medical records to FINRA, which they don't mention, which is sort of amazing. His infant son had something called H. pylori, which is bleeding ulcers. He'd been a preemie, he was having trouble keeping up his weight, and so he'd had emergency surgeries and had been in and out of the emergency room. That had led my client to have significant stress at work. He had a job where he was traveling 50 times a year, and he essentially had to cut way back on that to take care of his son. It's amazing that none of those facts about this unique level of stress made it into their decision. It's nothing that's challenged by them. They don't say it's not true, and the record was before them on remand. Well, I think what they say is that they looked at the nature of the conduct here, and it wasn't the type of conduct that's associated with a sort of spontaneous response to stress. Instead, it was, in fact, you're not challenging a year-long pattern of not only submitting the false reports, doing the false cell phone, collecting the money, throwing away paper when it started to cut, someone, the secretary, noticed that it might not be all lining up the way he was portraying it, lying to regulators. And so is it really fair to say they didn't address it, or they addressed it in a way that simply says this is not what we can count as an explanation as something caused by stress? I would say both, Your Honor. First of all, they don't address it adequately. They don't mention this is unique stress. They make it out in their decision as though he was under a little stress at work. Hey, we're all under a little stress at work. They discount the seriousness of this stress. Now, I agree, Your Honor. It doesn't fit the extremely narrow standard that FINRA and the Commission have put into place on their own without any court approving of it of when stress counts. Under their theory, essentially, you have to have a gun to your head to have the right amount of stress. It has to cause a momentary, immediate lapse in judgment. Now, that may be their standard. I don't believe that that standard properly captures the kind of stress that can cause. How much of a bar or suspension in this case would have been the line over which it is too far? I think a lifetime. A lifetime is too much. A lifetime is too much. Or what would have been appropriate? I think a two-year ban would have been appropriate. He's been under an 11-year ban. But how? And this is a question I have for both sides in this case, and I find very frustrating when we have these cases. How are we supposed to say when something is too much in this kind of case? And it would be a real challenge if I were here standing up saying, Your Honor, it should have been a two-year ban versus a five-year ban versus a lifetime ban. But all we're asking this court to do is say that a lifetime ban is too much. I don't think we can parse it that clearly, in part because neither the commission nor FINRA has said that. But how do we do that given our standard of review here, which is deferential? Then we've got the commission, which is reviewing FINRA. And a lifetime bar is a big deal, so I get that. And that's, to my mind, very serious, and I might not have done that on these facts. But I've got a deferential standard of review, so how am I supposed to start drawing lines here? I think you have to look at whether or not the record actually supports it. The primary reason they imposed a lifetime bar was because they said that Mr. Saad posed a threat to investors. Now, that is an incredible leap that is not supported by a single fact in this record. He submitted false reimbursements to his employer, absolutely. He admitted that. That does not justify a logical leap to say in the future. Again, you're leaving out the rest of the case. I think the threat was that he showed a pattern of deception, a refusal, which the arguments seem to keep doing, to acknowledge the scope of his misconduct, which wasn't just submitting the receipts, false receipts to the employer, but was keeping the roost going for a year, and then lying to regulators. Why isn't someone's willingness to lie repeatedly and then to lie or mislead regulators relevant to the threat they pose in an industry that depends mightily upon trust? Well, first of all, it was not a year-long course of conduct. I want to make sure the record is very clear. These were submissions that were made only in July 2006. Now, they were two submissions for travel and for a cell phone. There were then later misstatements to regulators, absolutely, but I would point out he was without counsel. He had corrected them fairly. What do you need counsel for to go to confess to your firm that I was under a lot of pressure, I spent the weekend, I shouldn't have? Absolutely, and it was the stress that led to that misconduct as well. I don't want the court to have the impression this was a year-long pattern where he engaged in all sorts of misconduct and in all sorts of lies. It was a single month with two submissions of $1,000. And now you are fighting with the facts found by FINRA, and that is that it was a long-ongoing intentional deception with repeated acts of factual findings you're not denying about misleading. When did the misleading of regulators happen? In 2006. Is that the same month you're talking about? It's four months later, November 2006 and April 2007. So I'm not saying that they didn't exist, Your Honor, but I do disagree with the idea that the commission can characterize a single bit of misconduct in July 2006, two misstatements later covering up the same exact misconduct, two isolated statements. He gave an entire on-the-record statement to them, and they don't cite anything else, not a single other misstatement in the entire on-the-record testimony. I'm not discounting that he did that at all. Neither is he. But the idea that they can then characterize those facts. Why did he go without counsel? He did not realize how serious it was. He then retained counsel, and that counsel, I think, was later convicted of a crime and was permanently barred by the SEC. He then retained Mr. Burke, who preceded me, and when Steve was named to the bench on the Superior Court, I replaced him. But he went in honestly because he did not realize how serious it was. How long was he with the company prior to this misconduct? Or is that not in the record either? I believe five years, Your Honor. And he stayed for six months after. And in the 11 years since, getting back to the SEC's point, that the reason they imposed this lifetime bar is to protect the investment community is that he poses a threat. There is simply nothing in the record. We have the perfect experiment to test that. If this was something he was going to do over and over, lie to regulators, submit false reimbursements, he had that chance in the last 11 years to do that. Well, Fenron said he didn't, given the nature of his limited role in the other firm. Well, that's not true, Your Honor. He's still in the insurance industry, and absolutely if he was going to submit false reimbursements, the same conduct here, or make any false statements to regulators, and they are heavily regulated, he certainly could have done it in the previous 11 years. The record here directly contradicts the conclusions the SEC wishes to make, which is that Mr. Saad poses some dire threat to investors that deserves a lifetime bar in this case. Can I ask one other question? Sure. Did you ever see at least one case where they imposed a bar but then said you can come back after, I think, five years? So it's almost like a probationary period or something. Right. Did he ask for that in this case? I don't believe he has, Your Honor. I know that during the case he proposed settlements to FINRA, which were never even responded to. So there were attempts to try to resolve it, including, as I understand it, after remand, to go back to FINRA and say, come on, let's work this out. It's already been eight years at that point, and FINRA has refused to do it. I don't want to get into settlement negotiations. Sure. But did he ever argue, as a legal matter, that that would be the appropriate way to deal with this? I don't believe he has, Your Honor. The only last point I'd make, if I can sneak it in very quickly, is to consider whether or not FINRA is actually exercising any discretion in conversion cases at all. So not only are you going to fit it in one minute and 30 seconds over time, but you didn't fit it in until your reply brief. Yes, Your Honor. This was not raised in the opening brief at all. That's correct, Your Honor. Thank you. Good afternoon, Your Honors. May it please the Court, my name is Dina Mishra. I am counsel for the respondent, United States Securities and Exchange Commission. There's a few things that I'd just like to respond to. I'm happy to obviously take questions at any time, so please just let me know. But one of the things I wanted to clarify, and I think this is clear to this Court, is that any of the challenges to the fact-finding on the, quote, you know, not taking seriously the seriousness of the stress or on the misleading behavior, for example, are all new at oral argument, and so under this Court's precedent, you know, it shouldn't be considered. Regardless, you know, the recounting of the facts, you know, really omitted one of the key lies, for example, in the case of the misleading behavior, which was that there were these notes from April 2007 that included an explicit lie about whether he knew the person for whom he had procured the cell phone and his reason for doing the cell phone purchase, whether it was to replace his own phone versus get it for somebody else. So those are things that are, you know, express evidence, and I think that the record kind of stands for itself in a lot of ways otherwise. In addition, to the extent that there's some question about the length of the misconduct, I think this got clarified, but just to be sure, it is a 10-month period because it goes from, you know, the beginning of the forgeries and the receipts being submitted, but also goes all the way through, you know, this November 2006 letters, both to FINRA and to state regulators, saying it was for a future trip, essentially a trip that had yet to occur. Also, as I just discussed, April 2007, and also call, and then also the on-the-record interview. To the extent that there's any question about whether there was a problem in terms of him not having an attorney, this was an argument that had been raised to some degree before but was expressly waived, I believe, before the commission. And so it's not something that should come up directly as an argument. In terms of the explanation as to why he didn't have counsel, it is clear that he admitted, I believe, at the disciplinary hearing that he probably did receive this addendum and this letter from FINRA that explained to him that at the on-the-record interview, for example, he could have counsel and that they would stop the interview at any time if they— So a lifetime bar, though, seems— Harsh. That's the word I was thinking of. Extreme, harsh. There's a lot of huge misconduct out there in this industry. And this is—not to minimize this, but this pales in comparison to a lot of misconduct that's out there in the industry, but it still gets the lifetime bar. So how is it remedial in that sense? Sure. So it is the highest sanction. No one's denying that. But the reason it's the highest sanction that was imposed here is that the particular type of misconduct that Mr. Saad engaged in, which includes everything from the beginning of all these forgeries and deceptive conduct— We had a bad weekend. He had a bad weekend. And then he went on to— And then he panicked. Right. And then he went on to— when his office administrator found that there was a discrepancy, he went on to continue to submit his receipts for reimbursement and just remove the telltale receipt, and then he didn't come clean to his firm for— It all stems from the bad—I understand. It all stems from the bad weekend, and then he's covering it up. And I'm not minimizing that. I'm just saying a lifetime bar seems— Absolutely. But crucially in this case, and I think this is true in general, which is that this court has sustained commission decisions that have upheld lifetime bars for other types of misconduct with respect to violation of the rules that include things that are justified just as the commission did here in a prophylactic, remedial way with respect to the public interest. I don't mean to interrupt. Oh, no, of course. How could we ever say—I'm trying to figure out what my role is here, which seems to be virtually nothing on this case, under your view. How could I ever say that something's not remedial? Well, I— Under your theory, which is if there's any misconduct at all, we have to protect investors, and that's remedial, and that's— And you would always want to protect investors forever. Right. No, Your Honor. To clarify, the misconduct that was at issue here was conversion, which goes to the very heart of what is most fundamentally problematic if a person is engaged in the financial industry and is going to mishandle or act dishonestly with money that's foreign to what the industry is. I understand what you're saying, but the theory remedial is not even the right term, but I realize it's the term in the case law for this concept. But how could we ever say something's not remedial? So, for example, if it was justified by some notion of moral desert or punishment or he should suffer, as opposed to— No, it's always—I mean, so long as the commission or FINRA says, someone did something wrong and we need to protect investors in the future from this person who's now a threat, how could we ever overturn that? How do you think we should ever overturn that or could? Well, I think it would have to depend on the particular commission opinion and what its rationale was and what it put forth with respect to its rationale. If its rationale was internally inconsistent or it was failing to account for a crucial issue, any of these normal arbitrary— What if it was the same case and it involved $50 for receipts and the commission said the same thing? So I think that what's clear is that the commission gave the rationale of explaining why conversion goes so centrally to what is problematic for a person that they are not suitable, in a sense, for the financial industry and the lifetime bar is really just barring them from associating with members in this particular industry. So that rationale would still certainly apply. Obviously, it would depend on the facts and circumstances of each individual case. What if the employer, broker, or insurance company had a rule, you can't take pens home, can't take office supplies home, and he takes one pen home, and the next day he's confronted by his superior, I saw you take the pen home, and he lies to him. And then three months later, he's confronted by the Venera police, and they say, did you take it home? And he says, oh, gee, I don't have a lawyer with me. No, I didn't take it home. And then he gets a lawyer and he comes back and he says he took it home. Same? So I think there are a couple of points to that, Your Honor. The first is one thing that distinguishes that situation from this one is that the handling of office supplies is somewhat different from the mishandling and misappropriating directly of funds, which is exactly the kind of management that someone has in the financial industry. It goes even more directly when it's consumption of funds or misappropriation of funds. So that's the first thing. The second thing is that in the case in which there is this misleading of regulators, the commission offered a rationale here that I think it would be important to question whether in your hypothetical that rationale also was present, which is that to the extent that there is this misleading of regulators or there is this dishonesty there in the follow-up, it is obviously it undercuts the ability of the commission to be able to, or rather, sorry, of FINRA in the first instance and the commission in assessing to be able to prevent the misconduct, to be able to detect it in the first instance. And that's a rationale that was provided and held by this court essentially or sustained by this court in P.A.U.S. 2, which is this notion that even when it's something like in P.A.U.S. 2, it was with respect to being completely forthcoming with information to regulators, there is this connection between depriving the regulators of their crucial information that they need in order to detect and prevent misconduct. So if there hadn't been the regulators in this case, if there hadn't been lying to the regulators in this case, then what? Then would the lifetime ban be okay? Well, as I noted, Your Honor, I think as to your hypothetical, there are differences that we're, you know, with respect to. No, I'm sorry when I say this case. I'm going back to Mr. Saad. Right, Your Honor. I think that the first rationale that's crucial is that when it comes to conversion or misappropriation of funds, it goes so centrally to what the financial industry is about that it can be that, you know, depending on the circumstances, that it is for FINRA in the first instance and then just for the SEC to determine whether it's excessive or oppressive in this court to decide if that was an abuse of discretion. You know, it can be that it is justified on the basis of the fact that it goes so fundamentally to what is the core of the financial industry. I'm just asking, would it go so fundamentally if there weren't the false statements to the FINRA investigators in this case? So I think that, you know— You would say yes, I take it. You would still say yes. So I think there are multiple rationales and that this court, I think, probably should find that both rationales are actually sufficient with respect to this type of misconduct and also with respect to the particular facts. I mean, I think that the whole package here is a very obvious case, but I also think that it is crucial to recognize that the commission has a long expertise and experience in this area. As you FINRA, these are members of the industry and they understand what these commercial standards are. I'm still stuck on how can a remedial sanction ever be excessive. I know when—I don't know, but punishment can be excessive, too much for a certain offense. But a remedial sanction is based on the concept that this is a bad person and this bad person will never change. That's the concept you're articulating to us. And I don't know if that's the case, how we could ever say that's too much or unreasonable. I don't think that's right, Your Honor. I think that the way the commission, for example, would be making the determination of what's excessive or oppressive in the first instance would be this determination of when you take remedial justifications only, not punitive justifications, like this is a bad person, which is not what the commission said here. That's exactly what they said, which is that we need to keep this person away from investors for the rest of his life. This is a risky person. This is a person who may cause harm because of the proven track record of having this misconduct and also covering it up and hiding it from regulators, so it makes it very difficult to detect. Those are remedial justifications. There are ways that it could be excessive if, for example, the only basis to justify a sanction of that type would be punitive. That's one example. I know, but that term, like it's either remedial or punitive, that's not an either-or. Well, the question is whether there is any remedial purpose, and that has been articulated, and I think that has to be articulated by the commission. We've articulated it. I just have trouble seeing how we can say it's excessive. Well, here I don't think you can, Your Honor. That's what I'm trying to draw out is I think the commission's position really is so long as it's remedial, it's going to be hard for us ever to we can pick at the reasoning of the commission, but it's going to be hard for us ever to say it's excessive. I think that's your position. And that makes me uncomfortable, but I'm having trouble figuring out how we can start drawing lines. Well, let me clarify why it is the case that this is the position. The reason is because if you look at the statute and you look at the way the statute talks about what the commission's review is for, it talks about having due regard for the public interest and the protection of investors, et cetera, and then it talks about doing this excessive or oppressive review. The whole point is that that actually informs what excessive or oppressive means in the context of the statute, presumably. So the idea would be that it needs to be excessive or oppressive as measured against remedial justifications only, not against things that are not just for the public interest, just for preventing misconduct, but things like moral desertion. If you've done a—I'm sorry to prolong this, but one more question. I'm apologizing to the Chief Judge. I have a question. If you did a 2-year bar or a 5-year bar and the rationale were remedial, the theory that you must be articulating is that the person can, in essence, correct themselves after 2 years or 5 years and be a better person and not be deceptive. And so you do that at times, right? The commission, FINRA, does that kind of bar at times, and it's still a remedial justification. But here it must be that we don't think this person can ever correct himself. Well, I think what's clear is that they're saying that any indications to the contrary, anything that—so the mitigating factors, for example, need to be assessed as to how would they affect whether this person is going to continue to pose the risk that the commission has found that FINRA is right in finding that you would impose. And so in assessing those remedial justifications, it is the case that you would have to sort of step back and look at them. And I think that abuse of discretion view obviously means that the commission just needs to essentially be reasonable about its reasoning. But it is not the case that this court should be imposing some kind of extra statutory substantive judgment about whether they think a different— or the court thinks a different sanction would be justified in the first instance. I think that's just statutorily what's required in this case and in general. Can I ask a statutory question? He was barred from being associated with any member of FINRA, correct? Correct. So why isn't this case under 78SF rather than E? Because 78SF covers the barring of any person from becoming associated with a member of a self-regulatory organization. Don't mind her, of course. But the reason I raise it is that statutory provision does not have the excessive or oppressive review. Right. So the first answer is that in this case, that's obviously not the ground on which this proceeded. There was a petition for review saying— We still review. We still review. It's just not for excessive or oppressive. Your Honor, I don't know that I feel comfortable answering that question without going back to the commission and finding out what the particular commission position might be on it, but let me just first take a quick look and see if there's anything I noticed off the— You said it was 78SF right after 78SE where everyone kept talking about in this case. Barring any person from becoming associated with a member of a self-regulatory organization, which is exactly the remedy, the sanction that was imposed here. Maybe go, Deanna. Your Honor, I apologize because I haven't taken a—I personally haven't taken a close look at this provision, but I— It's for you. I mean, it wasn't raised. I just couldn't figure out. I just thought it might be significant because it doesn't include the excessive or oppressive review. Sure. Certainly it wouldn't be implicated for this case, and I think it would be outside the realm of what this case's focus was. I can also go back to the commission later. That's exactly what happened in this case. I mean, if you think about what's going on here, we have private entities, right, FINRA, it's not the government, deciding who can be a member or affiliated with them or with their members, but it gets reviewed by the SEC because it implicates markets, and then we are round two of that review. But help us imagine why, when the bar just says you can't be part of this group, that in fact we don't look for excessive or oppressive review. Sure. So, Your Honor, I haven't taken a look at this closely. I would want to check with the commission on this. This is not a representation of the commission, but one thing that I do notice that's different about this provision is that it talks about from becoming associated. So it may be that this is a provision that directs to the initial becoming associated in the first instance as opposed to the ultimate sanction of removing someone from the association. I'm happy to check on that. If I'm incorrect on that, I'm happy to try to inform the court. But I do believe that no matter what, it's not implicated here, it's not the basis for the challenge here, and I don't believe it should be addressed. And I have one other question. So one of the things that the commission was to address on remand was this, I think it's principle 14 about whether someone potentially loses their job before the regulators show up on the scene. Right. And the FINRA's rationale for why it wasn't mitigating is that they say it's an inherent consequence of misconduct that you get fired by your employer, which seems to me is going to be true about 100% of the time. And they said you can still get another job, which would also seem to be true 100% of the time. So what I'm trying to figure out is when is 14 ever mitigated? Sure. So to clarify, I'd like to look at the specific language of the commission's opinion because I think it's important to understand what the commission was doing here. The commission noted that it held, it's previously held, that collateral consequences generally aren't mitigating. But then it said, that said, the guidelines direct that employment termination, which we have held as a firm decisionary action. Oh, I'm so sorry. It's JA 112. It's previously held. This is the most recent commission opinion. So the first sentence talks about what's been previously held. But then it says, that said. I can wait. Sorry, I apologize. I don't want to tell you. So at the bottom of that page before the footnotes, it says, we've repeatedly have held that paragraph. And the first line is what you're discussing. And then the second line says, that said, the guidelines direct that employment termination, which we have held as a form of disciplinary action, should be considered mitigating if it was related to the misconducted issue and it occurred before regulatory detection. But as we've held. I'm sorry, go ahead. Keep going. And then it says, but as we've held in similar situations, the mitigating effect from the termination is no guarantee of change behavior and may not be enough to overcome our concern that he or she poses a continuing danger. So what it's saying here essentially is it's acknowledging that the guidelines essentially may make termination actually something to be considered, which is what this court said in its first opinion. It pointed to that potential and highlighted that guideline. And then it goes on to say why there is not mitigating effect from Mr. Saad's termination in that whole next paragraph. I'm sorry. No, I guess I still understand what you're saying there. It'll be considered mitigating if it was related to the misconduct. What does that mean? So I think the idea would be that somehow the termination is going to be like discipline for the misconduct or. Isn't that what they said would always be true? You're getting fired. What is it that discipline for the misconduct? To clarify, though, so first of all, the guidelines aren't completely binding, and what the commission went on to say is that it's recognized that you have this initial guidance that this is the kind of situation where in the abstract termination might be mitigating. But then you have to look, obviously, to the facts and circumstances. I don't get when. I'm going to talk about this case. Oh, sure. I don't understand from these explanations when it's ever mitigating. Because I say it's not mitigating because if you get fired because that's what employers do when you engage in bad stuff and you could get another job, so why should we consider this a mitigating factor? But it's their principle that put it in there. Sure. So just to take one quick step back and just clarify, what I'm trying to say is that the commission didn't actually make a broad ruling about how it's only termination is only mitigating on these circumstances or it is, you know, it was transitioning from talking about how, yes, termination could be mitigating the abstract, and I do want to answer your question directly about when, what types of circumstances. But then it goes on to say, here are all the reasons why in this context, and it gives a paragraph of detail that is very specific to Mr. Sodden, and talks about how his termination obviously didn't dissuade further misconduct because he went on to mislead regulators and deceive them, et cetera. And then it goes on to, you know, to assess other things. I think the commission has also pointed out that he did get a new job very quickly that was, as he admitted, pretty much the same. Hypothetically, you know, there might be other situations, but obviously I can't prejudge for the commission here, but there might be situations in which if termination actually did, you know, certainly if termination completely foreclosed any possibility that there could be further misconduct. So, for example, if someone couldn't get another job in this type of industry given their qualifications or other types of things given what misconduct they had committed, hypothetically you could have situations in which termination would essentially sort of prevent there being remedial use for the sanction beyond that because that person is, you know, this is so far. I don't think they're so bad. If they did it so bad, no one will ever hire them? Then we'll consider it mitigating? No, no. To clarify, you know, as I said, I don't think I should take a broad position for the commission on this. Can you tell me when the commission has applied this as a mitigating factor? So I don't believe that that is something that has – I don't have a case for you off the top of my head. However, what I think is important here is that in this situation – I think she just asked whether you knew of another case. I think you answered that you don't know. Sure. I apologize, Your Honor. That's all right. All right. We'll hear from – is there any time left? We'll give you another two minutes. I'll try in two minutes to reach three of your questions. First of all, Judge Milla, to your point, you're exactly right. With this mitigating factor and the way they explain it in their decision, there is absolutely no way it would ever apply. Mr. Sodd fits that factor exactly. The commission does not disagree that all the facts are there, and it absolutely should have been applied. In fact, in a case – it's not cited in our brief, but I found later – it's against Tracy Chen. FINRA applied the exact mitigating factor under the exact circumstances. So they do sometimes apply it. They just refuse to apply it here, and I don't think for good reason. Second of all, Judge Garland, to your question, would $50 fit? There is nothing that FINRA or the commission has said that wouldn't allow a lifetime bar for conversion of $50. There simply is no standard. Every single case, and the lowest I found is $740, in a case cited in their brief, the Olson case, every single case they apply a lifetime bar. I understand this is serious. Mr. Sodd understands it's serious. But if there is no discretion being exercised between $50, $740, $1,144, and the case we cite in our brief, $96.5 million, then FINRA is not exercising its discretion. Now, we aren't asking for a broad ruling. I would love a broad ruling that an automatic lifetime bar for any level of conversion, which is effectively what exists here, on their own record, is problematic. But this Court at least can look at the facts of this case and the mitigating circumstances that have been proven. Every fact supporting them is here. To your question, Judge Kavanaugh, which is a very hard question, whether or not any remedial purpose fixes a punitive punishment, I think there's no question that this is punitive. I don't know how anyone can look at a lifetime bar for $1,144 and not say some level of that's punitive. The SEC can always say, as you pointed out, that there's a remedial purpose to it. But I don't think the standard can possibly be that a tiny bit of remedial purpose bleeds into an excessively and oppressive punishment, and that is enough to save them. So I would submit that although... Well, their theory is, and I'm not ascribing to this theory, but I think their theory is once dishonest, always a threat of being dishonest. Your Honor, you know, one, it's not true here because the idea that he spent the last 11 years without a single blemish on his record completely belies that. Completely. The other idea is... I'm not sure how we can take into consideration that at this point. I think that if you had done what I think maybe one of my colleagues suggested, filed a request to get back in, and they rejected it in the face of 11 years of good behavior, that would be back. But it's a little bit like saying the government had probable cause for the search because it turns out there's drugs in the pocket even when there wasn't probable cause before. I'm sure we will go back to them if the lifetime bar is imposed. And I would hope that they would consider everything here. But as long as we were on appeal, I don't think it makes sense to go back and ask. We did try and, you know, we did not. I'm not second-guessing your strategy. I'm just saying this particular set of facts go to a different case. They do, Your Honor. But I would just say that you cannot simply say a tiny bit of remedial purpose, which is frankly, that's just what they say. There is nothing here that really supports it or nothing that really shows a threat. He's just not a bad guy. The record doesn't show it. It was one bad weekend. He made very, very bad decisions. He did try to cover it up, no question. But the idea that that will lead to a complete bar in this industry. He's in the insurance field now. If he gets a lifetime bar, he can't be bonded. He can't keep his current job. So the idea that this only affects the securities industry is just not true. It affects many other parts of a person's employment. And I'd ask that you reverse. Thank you. I'll take the matter under submission. Thank you. Thank you. Call the next case.
judges: Garland, Kavanaugh, Millett